NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

QUADIR ARMSTRONG,

               Plaintiff,

               v.

NEW JERSEY DEPARTMENT OF
CORRECTIONS, et al.,

               Defendants.

Civil Action No. 20-5125 (KMW) (MJS)

**OPINION**

**WILLIAMS**, District Judge:

    This matter comes before the Court on Defendants' Motions seeking Summary Judgment in this prisoner civil rights matter. (ECF No. 36.) Plaintiff filed a response to the motion (ECF No. 44), to which Defendants replied. (ECF No. 46.) Also before the Court is Defendants' motion to seal portions of the summary judgment record. (ECF No. 38.) Having reviewed the motion to seal and having found that the documents in question, including Plaintiff's medical records, warrant sealing, Defendants' motion to seal shall be granted. For the following reasons, Defendants' motion seeking summary judgment is granted in part and denied in part.

## I.    BACKGROUND

    Following an incident in which he was shot in 2015, Plaintiff became a wheelchair bound paraplegic. (ECF No. 36-8 at 4.) Following his most recent conviction for drug and weapons charges in December 2016, Plaintiff was placed in South Woods State prison in January 2017. (ECF No. 37-10 at 2-4.) Following a short-lived transfer to Mid-State Correctional Facility in the

summer of 2017, Plaintiff returned to South Woods on September 1, 2017. (*Id.* at 3.) On October 25, 2019, he was transferred to Southern State Correctional Facility, where he remained until March 4, 2020, when he was moved to the Bo Robinson Treatment Center. (ECF No. 37-11 at 8.) Plaintiff was thereafter moved to the Garden State Youth Correctional Facility between May 23 and 29, 2020, before being transferred to New Jersey State Prison between May 29, 2020, and his ultimate release from custody in November 2020. (*Id.*) This suit deals with a number of incidents in which he alleges he was subjected to mistreatment during his prison stay between 2017 and 2020. (*See* ECF No. 4.)

Plaintiff's first claim deals with treatment he experiences at Mid-State Correctional Facility in the summer of 2017. At his deposition, Plaintiff testified that while at Mid-State for a rehabilitation program, he was barred from recreation, could not eat at a table as the mess tables were not situated for wheelchair use, and could not attend schooling or the law library. (ECF No. 36-8 at 5.) However, when his family complained, a ramp was built for him. (*Id.*) Plaintiff also testified that during one incident in June of 2017, while returning from an Islamic service, he was asked to take his hands out of his pants, which he was using to prevent himself from urinating. (*Id.* at 6.) Plaintiff did not, but gave his reasons for doing so. (*Id.*) As a result of his refusal, Plaintiff was instructed to strip down for a search. (*Id.*) While doing so, an Officer Snider accused Plaintiff of throwing a shoe at him, which resulted in "like six officers" including Snider, Sergeant Pearson, Sergeant Whittaker, Lt. Miller, and Sergeant Miller, attacking and pepper spraying him. (*Id.* at 6-7) Plaintiff was thereafter taken to medical and deposited in a cell. (*Id.*) Plaintiff hurt his knee in the process, but was provided medical attention after a delay which was apparently video-recorded. (*Id.*)

Plaintiff's next claim arises out of events which occurred on April 23, 2018, in South Woods State Prison. On that date, during a spot check of Plaintiff's medication, it was determined

that Plaintiff was missing a large number of his prescribed Neurontin pills. (*See* ECF No. 37 at 2.)   When confronted about this, guards reported that Plaintiff said he had taken the pills as a suicide attempt following the death of a family member. (*Id.*)   As a result, Plaintiff was placed on temporary suicide watch and given a disciplinary infraction, resulting in his ultimate removal to a disciplinary cell, and being moved into double cell housing on April 25, 2018. (*Id.*; ECF no. 36-2 at 4.)

Plaintiff next claims, that he was attacked and suffered injuries at the hands of his then cellmate, Jamel Allen, in April 2018 at South Woods State Prison. (ECF No. 36-8 at 7.) According to Plaintiff, on April 20, 2018, Allen assaulted his previous cellmate. (*Id.*)   Plaintiff testified at his deposition that an Officer Beatie thereafter told Plaintiff he wanted to see Allen fight someone. (ECF No. 9.)   On April 23, 2018, after Plaintiff was placed into his cell, Plaintiff contends Beatie transferred Allen into Plaintiff's cell. (*Id.* at 8-9.)   During a guard shift change, while Plaintiff was giving him his privacy to wash, Allen snuck behind him and began to beat him. (*Id.*)   Several inmates in adjacent cells called for an officer, at which point an Officer King arrived and ordered Allen to stop what he was doing. (*Id.*)   When Allen did not stop, the officer went to get help, and returned "three to four minutes" with a group of officers, at which point Allen stopped attacking him and the two were separated. (*Id.* at 9-12.)   As a result of the attack, Plaintiff suffered injuries including a concussion and damage to his ribs. (*Id.* at 10.)

At his deposition, Officer King testified that although he knew Allen was an inmate in his unit, he knew nothing else about him, and was unaware that Allen had previously been involved in any fighting with other inmates. (ECF No. 36-9 at 6-7.)   Likewise, although King was familiar with Plaintiff as having been in and out of the detention unit at the prison,  he had not had any prior interaction with him. (*Id.* at 9.)   According to King, he heard a commotion shortly after arriving to work, and he then went to Plaintiff's cell where he heard Plaintiff asking for help, and

3

called for a sergeant and more officers to come to help. (*Id.* at 7.) King testified that he initially did not see anything, but after he called for help, he saw Allen hit plaintiff with a shoe. (*Id.* at 7.) King testified that additional officers arrived in "less than a minute," at which point Sergeant Tomlin ordered the officers in to restrain both prisoners and end the fight. (*Id.*) King further testified that, after he was removed from his cell, a nurse saw to Plaintiff's injuries a "couple minutes" later. (*Id.* at 9.)

Sergeant Tomlin was also deposed regarding this incident. Although Tomlin did not have a clear memory of the event, he noted that he had written a report which stated that Allen had been moved into Plaintiff's cell at 8:30 p.m. (ECF No. 36-10 at 7-8.) Tomlin testified that upon discovering the attack by Allen, he called for help over the radio and Tomlin and other officers came to help, but that by the time they arrived Allen had ceased his attack and separated from Plaintiff following King's order. (*Id.* at 10.) Tomlin also reiterated that in his report he wrote that, when he arrived following King's call for help, they found Plaintiff in his wheelchair. (*Id.* at 8.) According to his report, Tomlin testified that following the officers separating the two and sending Plaintiff for treatment, Allen was moved to an administrative segregation unit and issued charges. (*Id.* at 9-10.) Tomlin testified that he did not know why Allen was placed in Plaintiff's cell, that he had no previous knowledge of or dealings with Allen, and had no clear way of knowing why he was there from the available paperwork that he received as an officer on the unit. (*Id.* at 10.) Finally, Tomlin testified that all of the cells in his unit are handicap accessible, and that inmates including Plaintiff eat in their cell or a dayroom, which is also handicap accessible. (*Id.* at 11.)

The officers' report regarding this incident largely mirrors their testimony. (*See* ECF No. 37 at 3.) According to the report, shortly after arriving at 10:00 p.m., Officer King heard shouting, entered Plaintiff's unit, followed the direction of other inmates to Plaintiff's cell and saw Plaintiff

and Allen, he then saw Allen strike Plaintiff and ordered them to separate, and Allen moved away. (*Id.*)  According to the report, King called for help, other officers arrived, and the two were separated and moved out for examination, at which point Plaintiff was taken to the hospital for treatment, and Allen was moved to punitive housing and issued institutional charges for attacking Plaintiff. (*Id.*)

In May 2018, Plaintiff filed a Prison Rape Elimination Act complaint against an Officer Busnardo, who Plaintiff claimed told him to show him his genitalia. (ECF No. 36-2 at 7; ECF No. 44 at 46.)  According to Plaintiff, Busnardo thereafter threatened to attack Plaintiff when he was next out of sight of cameras. (*Id.*)

In the ensuing months at South Woods, while still in punitive housing, Plaintiff requested to be placed into a handicap cell rather than be returned to the wheelchair accessible but not rail equipped cell in which the April 26 attack had taken place, but he was told the one of the handicapped cells in the detention unit was already in use by another inmate. (ECF No. 36-8 at 13.)  Plaintiff admitted in his deposition, however, that the cell in which he was placed prior to the disciplinary housing and after his return to general population was handicapped accessible. (*Id.*)

Plaintiff also testified at his deposition to having issues contacting his attorney while in South Woods. (*Id.* at 14.)  Specifically, he testified that his attorney's phone number was restricted when he attempted to call it, so he put in requests to have the number made available to him, which Plaintiff testified he was told would be done. (*Id.*)  Because the number was not immediately added to the call list, however, Plaintiff had to contact his attorney through writing instead. (*Id.*)  Plaintiff conceded at his deposition, however, that the officers to whom he complained "wouldn't have the power" to make the number unrestricted, that this was instead a system wide issue. (*Id.* at 14-15.)

Plaintiff later had issues with his physical therapy teacher, Miss Angie. (*Id.* at 16.) Initially, Plaintiff had braces to help him stand for brief periods during therapy. (*Id.*) Those braces, and Plaintiff's personal tablet, were both taken from him during a cell move to administrative segregation related to his being charged with misusing medication as detailed in the next paragraph. (*Id.*) As the result of the loss of the braces, Miss Angie told him he could no longer do the physical therapy, although she also told him that the therapy was unnecessary as there was no hope of restoring Plaintiff's ability to walk. (*Id.* at 15.)

The loss of the braces and tablet during a move was a result of an incident in June 2018. Specifically, during a check on Plaintiff's cellmate, Plaintiff was accused of abusing his medication again, specifically that he had illicitly taken suboxone, which Plaintiff claims he did not have at that time. (*Id.* at 16.) Plaintiff was urine tested and placed in a medical observation room for several days during which he did not have wheelchair access and had to use a milk carton to relieve himself if he could not get a nurse to find someone to help him onto the toilet. (*Id.* at 17-18.)

In March 2020, Plaintiff was scheduled for transfer to the Bo Robinson Assessment and Treatment Center, a halfway house facility. (ECF No. 36-2 at 9.) When Plaintiff was brought out to the busses for transportation, however, there was no available wheelchair van to transport him. (ECF No. 36-8 at 19-20.) The guards, uncertain as to why there was no vehicle to transport Plaintiff other than a bus he could not ride, called for more information. (*Id.* at 20.) Plaintiff was returned to the prison and told he would need to wait a few days for a handicapped vehicle to transport him. (*Id.* at 20.) The prison administrator and several other officials spoke with and apologized to Plaintiff as this occurrence was an accident that was not supposed to happen. (*Id.* at 21.) The prison made arrangements for Plaintiff and transferred him a week later. (*Id.*)

In the final incident, Plaintiff was transferred to New Jersey State Prison in advance of his release from custody. (*Id.*) While he was there, a fight between other inmates occurred, and Plaintiff was separated and temporarily placed in a facility without a handicapped shower for several days, but was provided with equipment with which to wash himself. (*Id.* at 21-22.) Plaintiff was then moved to a cell in New Jersey State Prison, but that cell's door was too small for Plaintiff's wheelchair to fit through. (*Id.* at 22.) A sergeant was called, and they used a make chair system using a repurposed shower chair to help Plaintiff get in and out of his cell. (*Id.*) This system was less than ideal, and led to Plaintiff falling. (*Id.*) He was then provided with medical attention. (*Id.*) Plaintiff testified that Plaintiff's placement in this cell, however, was the result of COVID-related restrictions on transfers. (*Id.* at 21.)

## II.   <u>LEGAL STANDARD</u>

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.  However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial."
>
> *Serodio*, 27 F. Supp. 3d at 550.

## III.   **DISCUSSION**

### A.   **Exhaustion**

In their motion, Defendants contend that Plaintiff's claims were not properly exhausted and his complaint must be dismissed.  Pursuant to 42 U.S.C. § 1997e, a prisoner must exhaust all available administrative remedies before filing a civil rights action challenging prison conditions. *Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006).  Indeed, a prisoner is required to "exhaust administrative remedies even where the relief sought – [such as] monetary damages – cannot be granted by the administrative process." *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 734 (2001). Where an administrative procedure is available, a plaintiff seeking to challenge prison conditions via a federal civil rights action must fully and properly exhaust his administrative remedies prior to filing suit, and exceptional circumstances will not excuse a plaintiff's failure to exhaust his

claims. *Ross v. Blake*, --- U.S. ---, ---, 136 S. Ct. 1850, 1856-57 (2016). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Booth v. Churner*, 206 F.3d 289, 298 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001).

The chief dispute between the parties appears to be whether administrative remedies were available to Plaintiff in prison, and whether he actually attempted to make use of available remedies. What the parties largely ignore, however, is the fact that Plaintiff filed an amended complaint in this matter on December 9, 2020, a month after his release from prison. (*See* ECF No. 4; ECF No. 36-8 at 4). In *Garrett v. Wexford Health*, 938 F.3d 69, 84 (3d Cir. 2019), the Third Circuit held that while a failure to exhaust prior to the filing of suit by a prisoner warranted the dismissal of his complaint, that deficiency could be cured by the filing of an amended complaint following a plaintiff's release from prison as the exhaustion requirement does not apply to those who are not prisoners at the time of the filing of their operative complaint and an amended complaint filed following release supersedes and replaces the original prisoner complaint. Because Plaintiff filed an amended complaint after his release from prison, and that complaint replaced the original complaint that he filed as a prisoner, the amended complaint cured any filing defect in the form of a failure to exhaust administrative remedies. *Id.* That Plaintiff does not appear to have properly exhausted his claims is thus immaterial – the exhaustion requirement does not apply to his operative complaint, and that complaint's filing removed the requirement that his unexhausted claims be dismissed under § 1997e under Third Circuit precedent. *Id.* Defendants are therefore not entitled to the dismissal of Plaintiff's complaint for lack of exhaustion.


**B.      Time Bar**

Defendants next contend that several of Plaintiff's claims are time barred.  In this matter, Plaintiff raises three types of claims – claims under 42 U.S.C. § 1983 asserting violations of his constitutional rights, claims of disability discrimination under the ADA and Rehabilitation Act, and state law tort claims.  All three classes of claims are subject to the same statute of limitations – New Jersey's two year statute of limitations for personal injury torts.  *See Disabled in Action of Pa. v. S.E. Pa. Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008) (both ADA and Rehabilitation Act claims are subject to the general personal injury statute of limitations of the forum state); *see also Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013) (§ 1983 claims subject to state personal injury statute of limitations, which in New Jersey is two years).  In this matter, Plaintiff filed his initial complaint on April 26, 2020.  (ECF No. 1.)  Defendants therefore argue that those of Plaintiff's claims which accrued before April 26, 2018 – which include Plaintiff's claims related to his stay at Mid-State in 2017 during which he was allegedly denied access to certain facilities for lack of wheelchair accessibility, his claims regarding being strip searched and manhandled after having a hand in his pocket in 2017, and his claims related to being charged with abusing his medication on April 23, 2018, are time barred.

Although Plaintiff recognizes that several of his claims accrued more than two years before he filed suit in this matter, he contends that his limitations period should be tolled because he was required to exhaust his claims.  Absent a conflict with federal law, federal courts apply the tolling principles of the state in which the claims arose in federal civil rights actions.  *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015).  Under New Jersey law, a statute of limitations may be equitably tolled in three circumstances: where the plaintiff was induced or tricked into missing a deadline by his adversary, where the plaintiff was "in some extraordinary way" prevented from asserting his claims in a timely fashion, or where the plaintiff timely asserted his claims in the wrong forum or through a defective pleading.  *See Binder v. Price Waterhouse &*

*Co.*, 923 A.3d 293, 298 (N.J. App. Div. 2007).  As the exhaustion requirement is a statutory prohibition to filing suit for a prisoner, the Third Circuit has held that a civil rights claim's statute of limitations  may be tolled while a prisoner is engaged in exhausting his administrative remedies as doing so is essentially the prisoner's attempt at removing an obstacle to filing suit.  *Pearson*, 775 F.3d at 602-04.  Although that case was decided under Pennsylvania law, courts in this district have generally found the reasoning applicable under New Jersey law.  *See, e.g., Valdez v. Schillari*, No. 16-2943, 2017 WL 6619328, at *7 (D.N.J. Dec. 27, 2017); *Kelly v. Lanigan*, No. 14-3165, 2015 WL 5164871, at *5 (D.N.J. Sept. 2, 2015).

 *Pearson* and its progeny, however, do not stand for the proposition that limitations periods will be tolled unless and until a prisoner either completes the exhaustion of his claims or is released. Statutes of limitations will only be tolled while a prisoner is actually engaged in the exhaustion process.  *See, e.g., Jones v. Unknown D.O.C. Bus Driver & Transportation Crew*, 944 F.3d 478, 481-82 (3d Cir. 2019); *Montalban v. Powell*, 799 F. App'x 111, 112 (3d Cir. 2020).  A claim will therefore be tolled through exhaustion *only* while an administrative remedy is actually pending, and not during the period before the prisoner attempts to file such a remedy or after his remedies cease to be pending.  *Montalban*, 799 F. App'x at 112.  If a prisoner fails to even attempt exhaustion, clearly no tolling would apply.  *Id.*

 In this matter, Defendants have produced all remedies filed by Plaintiff that they possess, which they contend include all of the remedies Plaintiff filed and are considerable in number.  Of these remedies, none reference the abusing medication incident or the strip search.  As to Plaintiff's stay in Mid State, although a few do reference his complaints about access to the facility, each received a response within a couple of days indicating steps were being taken to alleviate the issue which was not appealed.  (*See* ECF No. 36-11 at 219.)  In response to this lack of evidence of relevant grievances, Plaintiff provides a certification in which he asserts, with limited detail at best,

that he filed various grievances during his stay to which he did not receive a satisfactory response. (*See* ECF No. 44 at 27-34.)  Plaintiff provides no specific details as to any grievances filed relevant to the three untimely claims – he does not allege when he filed any grievance as to those claims, when he filed repeat grievances, or when any action or inaction on those grievances may have occurred, and instead just states that he filed many grievances without specific reference to those incidents.  Instead, he provides detail only as to grievances filed in relation to the April 26 attack and other, later issues not relevant to the time bar issue.  (*Id.*)

Such vague and self-serving assertions in an affidavit, which lack specific factual information, are insufficient to show, in response to a summary judgment motion, that a prisoner engaged in the grievance process.  *See, e.g., Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018).  Plaintiff has failed to provide any concrete factual statements or similar information sufficient to show that he had filed proper grievances sufficient to warrant tolling as to the untimely claim, and has thus not shown that he had pending, grievances which were not answered and which languished and prevented him from timely filing suit.  Instead, the record indicates that the one on point grievance he did file in 2017 as to the Mid-State situation was responded to in short order – two days later– and resulted in positive progress.  Even providing Petitioner the benefit of those two days, his claims relating to the 2017 incidents and the April 23 incident do not become timely. Because Petitioner has failed to show he had pending grievances sufficient to warrant tolling, his claims arising before April 26, 2018, are all time barred and are dismissed as such.  *Montalban*, 799 F. App'x at 112.

### C. Plaintiff's non-NJCRA[1] state law claims

Defendants next contend that Plaintiff's state law claims must be dismissed because Plaintiff failed to file a notice of claim for any state law tort claim other than those related to the April 26, 2018, attack, and because the New Jersey Tort Claims Act provides immunity for damages arising out of attacks by other inmates. Plaintiff does not dispute that he failed to file a notice of claim for any claim other than the April 26, 2018, attack. (*See* ECF No. 36-2 at 11; ECF No. 44 at 50.) The New Jersey Tort Claims Act serves as a limited waiver of sovereign immunity by the State of New Jersey and controls the liability of New Jersey's public entities and their employees, including the New Jersey Department of Corrections, its prisons, and employees. *See, e.g., Gaston v. New Jersey*, 298 F. App'x 165, 167-68 (3d Cir. 2008); *N.J. Stat. Ann.* § 59:8-1, *et seq.* Under the NJTCA, a plaintiff seeking to "maintain an action against a public entity or public employee . . . must file a notice of claim with either the State Attorney General or with 'the department or agency involved in the wrongful act or omission . . . within 90 days of the accrual of the cause of action." *Gaston*, 298 F. App'x at 167-68 (quoting *N.J. Stat. Ann.* § 59:8-7). Failure to do so requires the dismissal of a Plaintiff's state law tort claims. *Id.* at 168. Because Plaintiff admitted he did not file a notice of claim for any state law tort other than those related to the April 26, 2018, incident, his remaining state law claims must be dismissed for failure to comply with the NJTCA. *Id.*

---

[1] Claims brought pursuant to the NJCRA are analogues to federal claims brought pursuant to 42 U.S.C. § 1983 and are subject to the same defenses, standards, and immunities. *See, e.g., Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). They are thus generally coterminous with the equivalent federal civil rights claim. *Id.* NJCRA claims, however, are not subject to the New Jersey Tort Claims Act's requirements and provisions. *See Teel v. Eliasen*, No. 17-2253, 2018 WL 5307806, at *3 (D.N.J. Oct. 26, 2018). This Court thus evaluates Plaintiff's NJCRA claims, to the extent they are raised separately, alongside his federal civil rights claims, and in this section dealing with state law tort claims discusses only Plaintiff's tort claims raised in Count IV of his amended complaint.

Defendants also argue that they are immune from suit for the claims arising out of the April 26, 2018, incident because the NJTCA grants immunity for damages arising from attacks by inmates on other inmates. Under the Act, neither public entities nor their employees shall be liable for "any injury caused by . . . a prisoner to any other prisoner." *N.J. Stat. Ann.* § 59:5-2(b)(4). Under this statute, the New Jersey courts have found a prison official will be immune from injuries resulting from an attack by one cell mate on another "even if the defendants knew the cell-mate had a history of violent assault, and thus were grossly negligent in separating the plaintiff and the cell-mate." *Kaseem Ali-X v. Power*, No. 10-2990, 2013 WL 4588615, at *3 (D.N.J. Aug. 8, 2013) (citing *White v. Lewis*, 383 A.2d 744, 746 (N.J. Super. App. Div. 1978)). Plaintiff's injuries related to the April 26, 2018, incident fall into exactly this category – the failure of prison officials to keep Plaintiff separate from Allen despite at least Officer Beattie being aware of Allen's violent streak. Although Plaintiff provides testimony suggesting Beattie hoped the two may quarrel, there is nothing to suggest the attack by Allen was a direct result of anything other than Allen's own choices, and the injuries arising from the attack match those found subject to immunity in *White* almost exactly. *Id.* Plaintiff's state law tort claims related to the April 26, 2018, incident are therefore dismissed because Defendants are immune under the Act. *Id.* All of Plaintiff's non-NJCRA state law claims are therefore dismissed with prejudice pursuant to the NJTCA.

### D. Plaintiff's Federal Civil Rights Conspiracy Claims

Defendants next argue that they are entitled to judgment as a matter of law as to Plaintiff's conspiracy claims because Plaintiff has failed to produce any evidence to support a claim of conspiracy. In order to make out a claim of civil rights conspiracy, a Plaintiff must prove the elements of a conspiracy – a "meeting of the minds" shown through agreement and concerted action. *See Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008). The "bare allegation of

an agreement is insufficient to sustain a conspiracy claim," *Brown v. Deparlos*, 492 F. App'x 211, 215 (3d Cir. 2012), and a Plaintiff may not show a conspiracy by merely showing that two parties' actions had the same result or were the result of conscious parallelism without evidence supporting agreement and concerted action. *Desposito v. New Jersey*, No. 14-1641, 2015 WL 2131073, at *14 (D.N.J. May 5, 2015). Here, Plaintiff has presented no actual evidence of a conspiracy. The testimony of Plaintiff at his deposition suggests that, at least related to the April 26 incident, Officer Beattie was hoping for conflict between Plaintiff and his cellmate, but he has failed to even suggest anything showing that the other officers agreed with that goal or tried to carry it out. Indeed, the two officers who were deposed both stated that they knew nothing about Allen or his history, and stated that they were unaware of any such intention on Beattie's part. Because Plaintiff has likewise failed to produce any evidence of a meeting of the minds among Defendants as to any of his other claims, he has failed to provide any evidence, let alone a dispute of material fact, as to conspiracy, and Defendants are entitled to summary judgment on Plaintiff's conspiracy claims as such.

### E.  Plaintiff's Due Process and Punitive Damages claims

Defendants argue that Plaintiff's Due Process claim, asserted in his amended complaint as a sort of catch all duplication of his other federal civil rights claims, must be dismissed because it does not apply where a more specific right governs the claims at issue. Plaintiff has presented no argument in his briefing to oppose this argument. Under the "more-specific-provision rule," "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Betts. V. New Castle Youth Development Center*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997)).

Thus, where, as in Plaintiff's Eighth Amendment civil rights claims here, a claim is raised both as an Eighth Amendment claim such as failure to protect and as a Due Process claim, the claim may only be raised pursuant to the Eighth Amendment, which subsumes any Due Process claim related to the event. As Plaintiff's constitutional claims here all arise out of the Eighth Amendment as a convicted prisoner, that amendment's standards control, and no Due Process claim is available. *Id.* at 260-61. Therefore, Plaintiff's Due Process claims are dismissed.

Defendants likewise contend that Plaintiff's stand-alone claim for punitive damages must be dismissed because punitive damages are not separate or distinct from an underlying entitlement to relief. Plaintiff does not dispute the point, and Defendants are correct. *See Giordano v. Solvay Specialty Polymers USA, LLC*, 522 F. Supp. 3d 26, 38 (D.N.J. 2021) (although a party may seek punitive damages for an alleged tort or constitutional claim, such a claim is merely incidental to a cause of action and is not a cognizable stand-alone basis for relief). Thus, while Plaintiff may seek punitive damages at trial where available, to the extent he intended Count VIII of his complaint to serve as a basis for relief in the form of punitive damages, that claim is dismissed as not cognizable. *Id.*

### F. Plaintiff's failure to protect claim[2]

Defendants next contend that they are entitled to judgment as a matter of law as to Plaintiff's failure to protect claim related to the April 26, 2018, assault by Allen. To make out an Eighth Amendment failure to protect claim, a plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants were "deliberately indifferent" to that risk of harm. *Belt v. Fed. Bureau of Prisons*, 336 F. Supp. 3d 428, 438-39

---

[2] Because Plaintiff lumps his policy/supervisory claims raised under § 1983/the NJCRA and the ADA together, this Court addresses the supervisory claims separately below.

(D.N.J. 2018); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated in part on other grounds by Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3d Cir. 2020). An officer will only be deliberately indifferent where he knew of and disregarded a known risk of serious harm. *Belt*, 336 F.3d at 438. One subset of failure to protect claim is a claim for failure to intervene in an altercation between inmates – a claim which requires a plaintiff show that the officer had a "realistic and reasonable opportunity to intervene" in a conflict between prisoners and "simply refused to do so," resulting in harm to the plaintiff. *Bistrian*, 696 F.3d at 271; *Smith*, 293 F.3d at 650-51.

Defendants argue that they are entitled to judgment on this claim as the two officers who sat for depositions, King and Tomlin, testified that they had no prior interaction with or knowledge of Allen or any risk he posed to Plaintiff. Plaintiff counters by pointing to his own testimony that another officer, Beattie, told him he knew of Allen's history of violence and that he wanted to see the two fight. Plaintiff also suggests that Defendants should have known that Allen had prior disciplinary charges related to a prior fight because he was subject to an order of no contact. Finally, Plaintiff contends that his wheelchair status alone may support his claim because he believes his cell was not wheelchair accessible.

Turning first to the wheelchair issue – although Plaintiff asserts the cell in which he was housed at the time was not wheelchair ready, his own testimony shows both that he did have use of his wheelchair in the cell, and that his wheelchair could be used to exit and enter the cell. There is nothing in the record sufficient to show that Plaintiff's wheelchair status alone amounted to an undue risk of harm. Plaintiff's allegations regarding the keep separate order are similarly unconvincing – the records submitted clearly indicate that the keep separate order was only entered *after* the altercation with Allen and was specifically designed to keep only those two separate *because* of the attack on April 26, 2018. (*See* ECF No. 37-11 at 9.) The keep separate order is

thus a red herring. Because this Court has already found that Plaintiff has failed to set forth any conspiracy, Plaintiff likewise cannot impute the knowledge he testified Beattie possessed to all of the other officers – Plaintiff provides no testimony specifically showing that any of the other named Defendant officers actually had knowledge of Allen's history, or had reason to know that he posed a direct threat to Plaintiff, rather than merely to the alleged prior cellmate he attacked. Indeed, the Third Circuit has held that allegations of a general "history of violent assaults against other inmates," in the absence of any specific threat to the plaintiff, is too speculative to support a claim of deliberate indifference. *Bistrian*, 696 F.3d at 371.

Here, the record indicates that Allen told officers after the fight that his attack on Armstrong was not motivated by any specific aspect or trait on Plaintiff's part, but was an outburst as a result of Allen's general anger with his situation. (*See* ECF No. 37 at 3.) Plaintiff has identified only one officer who clearly had knowledge of even this history – Defendant Beattie. Absent the conspiracy this Court has already rejected, and because there is no testimony sufficient to impute this knowledge to any other named Defendant, this Court cannot find that any Defendant except Beattie, was clearly aware of Allen's history,, especially in light of both Tomlin and King testifying that they knew nothing of Allen or his history. As the record is devoid of facts sufficient to show that any Defendant other than Beattie knew of and disregarded the risk Allen posed to Plaintiff, there is no genuine issue of material fact as to whether the non-Beattie Defendants were deliberately indifferent to that risk, and the Defendants other than Beattie are entitled to summary judgment as to the portion of Plaintiff's claim related to the decision to house the two together.

Turning to Beattie, Plaintiff pleads that Beattie knew of Allen's prior attack on a cellmate, that Beattie told him that Allen had attacked an old man in another cell, and that he wanted to "see him go up against somebody that's tough." (ECF No. 36-8 at 9-10.) Plaintiff also states that Beattie placed Allen in Plaintiff's cell, and that he assumed that Beattie thought Plaintiff was the

sort of "tough" guy he wanted to see Allen fight. These allegations, if credited by a jury, do more than show a mere knowledge of a speculative history of violence, and instead indicate that Beattie apparently knew Allen was dangerous, knew he was likely to attack his next cell mate, wanted to see that happen, and thus placed him with Plaintiff in the hopes of such an attack occurring. These facts, if credited, would be sufficient to show that he knew of the risk Allen posed, was aware it was likely to spill over into an attack on Plaintiff, and placed them together expecting an attack to occur. Thus, a genuine issue of material facts as to the question of whether Beattie was deliberately indifferent to a severe risk to Plaintiff's health and safety, and Beattie is thus not entitled to summary judgment on Plaintiff's failure to protect claim.

Putting Beattie aside, there is also a second aspect to Plaintiff's failure to protect claim – that the officers who responded to the attack failed to properly intervene to protect him from Allen's attack. As to this claim, the relevant defendants would be King, Tomlin, and the other responding officers. Here, the facts clearly indicate that the officers did have a reasonable opportunity to intervene to end the attack once King discovered the altercation, and that the officers did take some action – the parties agree that King ordered Allen to stop, called for help, and then he and the other officers engaged to separate the two. Although Plaintiff equivocated in his deposition as to why Allen stopped – a result of the officers ordering him to stop and deploying means such as pepper spray to achieve that result or Allen merely choosing to end the attack, Plaintiff's own deposition testimony shows that once the additional officers arrived to help King, the altercation was put to an end in short measure and the officers did take steps to intervene and end the assault. Thus, Plaintiff fails to make out a claim for failure to intervene as to Tomlin and the other officers who helped King end the attack as they did intervene to the extent they could and separated the two.

The question as to King is more complicated. As to King, it is clear that he did have an opportunity to intervene when he found Plaintiff being attacked by Allen shortly after 10:00 p.m. Its also clear that King did indeed take steps to address the situation – he ordered Allen to stop and called for more officers to help restrain and remove Allen. The parties disagree, however, over the fine details – Plaintiff testified that King ordered Allen to stop, then left for three to four minutes to get help before separating the two, while the officers maintain King never left and merely radioed for help. Plaintiff likewise testified that King took no action to stop Allen other than ordering him to stop – an order Plaintiff states Allen ignored – while King states that Allen stopped immediately and the two remained separate while King awaited the arrival of help while watching over the two.

Construing the facts in Plaintiff's favor as the non-moving party, this Court is faced with a factual scenario in which an officer responded to calls for help from inmates, went to the cell in question, saw an attack, ordered the attacking inmate to cease, and then called for help before returning to break up the attack three to four minutes later with the help of other officers. Even under Plaintiff's version of events, King did take steps to address the situation, and the question is whether those steps are sufficient to show that he is not liable.

As the Third Circuit explained in *Bistrian*,

> [n]o doubt, there are some circumstances in which an officer's response to an inmate attack is so half-hearted that it effectively amounts to no response at all. . . . But surely there are cases at the other end of the spectrum in which an inmate fails to [show] that an officer's response was so unreasonable as to give rise to an entitlement to relief. For example, if an inmate alleges that an assailant landed two punches in rapid succession, the fact that guards saw the first punch and reacted quickly enough to prevent a third, but not the second, is not unreasonable. . . . The key is whether prison officials acted reasonably; if so, they cannot be found liable on a failure-to-protect claim.

696 F.3d at 371-72.  Where a plaintiff contends that an officer directed an assailant to stop, but did not enter the fray to end the assault until enough staff were present to help, the Third Circuit found that such a situation could give rise to liability if the delay before help arrived were sufficiently long and the assailant continued a violent assault in the meantime.  *Id.* at 372.  Here, the parties disagree on the key issues – Plaintiff contends there was a three to four minute delay, King that the delay was a matter of moments; Plaintiff contends that Allen continued the assault unabated, King that the assault ended at his command and that he watched to make sure it did not resume without leaving.  There are thus genuine issues of material fact in this matter as to whether King's response to the situation was adequately reasonable, and King has thus failed to show that he is entitled to summary judgment as to this part of Plaintiff's failure to protect claim.

In addition to arguing that they are entitled to summary judgment as to the failure to protect claims, Defendants also argue they are entitled to qualified immunity as to those claims as Plaintiff has failed to show a constitutional violation.  In making this argument, however, Defendants do not argue that Petitioner's right to be free from attack without intervention from responding officers was not clearly established – indeed, they directly concede that Plaintiff had a clearly established right "not to have prison officials stand by and watch him be assaulted" by another inmate. (*See* ECF No. 36-1 at 38.)

"The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In determining whether immunity applies, courts use a two pronged test: "a court must decide 'whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right'[, a]nd second, the Court must determine 'whether the right at issue was clearly

established at the time of [the] defendants alleged misconduct.'" *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). As Defendants concede that Plaintiff's right in question was clearly established, the only issue before the Court is whether Plaintiff has shown a violation. As discussed above, Plaintiff has shown that there is a genuine issue of material fact as to whether Defendants Beattie and King failed to protect him from the threat Allen posed either before or during the assault. Thus, were a jury to credit Plaintiff's version of events, that version of events would show a constitutional violation. As such, and in light of Defendant's concession that the right in question is clearly established, Defendants King and Beattie are not entitled to qualified immunity at this time. Because Plaintiff failed to show a violation of his rights as to the remaining officer Defendants for the reasons expressed above, however, the officers other than King and Beattie are entitled to qualified immunity. Whether construed as a direct argument for judgment or a claim for qualified immunity, the non-supervisory Defendants other than Beattie and King are entitled to judgment as to the failure to protect claims, but summary judgment as to the failure to protect claims only is denied as to Defendants Beattie and King.

### F. Plaintiff's ADA/Rehabilitation Act Claims

Defendants next contend that they are entitled to summary judgment on Plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act. The "substantive standards for determining liability are the same" under either Act. *Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 288 (3d Cir. 2019) "To state a claim under either the ADA or the [Rehabilitation Act, a plaintiff] must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by

reason of his disability." *Id.* at 288-89. Under the Rehabilitation Act, a plaintiff is also required to show that the entity which allegedly discriminated against him received federal funding. *See, e.g., CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 n.10 (3d Cir. 2013); *Owens v. Armstrong*, 171 F. Supp. 316, 328 (D.N.J. 2016). To establish causation sufficient to state a claim for relief under the Rehabilitation Act, a plaintiff must plead facts showing that his disability was "the sole cause of discrimination" against him, while the ADA instead requires "but for" causation. *Furgess*, 933 F.3d at 291 n. 25; *C.G.*, 734 F.3d at 236 n. 11. To make out a claim for damages, as opposed to injunctive relief, the plaintiff must show intentional discrimination. *Furgess*, 933 F.3d at 289. Thus, because Plaintiff seeks only money damages,[3] he must show that he has a qualifying disability, that he was precluded from participating in a prison program, service, or activity or was otherwise discriminated against by reason of his disability, and that the discrimination against him was intentional. *Id.* The standard for determining whether discrimination was intentional in this context is deliberate indifference. *Id.; see also S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 264-65 (3d Cir. 2013).

Defendants do not dispute that Plaintiff has a qualifying disability, nor that they are subject to suit under the Act insomuch as the New Jersey Department of Corrections receives federal funding. Instead, they argue that they are entitled to summary judgment on Plaintiff's ADA/RA claims because Plaintiff has failed to show that any of the complained of events amounted to intentional discrimination because of Plaintiff's disability. In response, Plaintiff provides the following as the basis for his ADA/RA claims – the failure to constantly ensure Plaintiff had a

---

[3] Plaintiff requested only money damages in his complaint, but even had he wished for injunctive relief, his release from prison would render a request for such relief moot as he is no longer subject to prison conditions following his release. Likewise, because punitive damages are not available under the ADA or Rehabilitation Act, *see Barnes v. Gorman*, 536 U.S. 181, 189-90 (2002), only compensatory damages are available on these claims.

wheelchair accessible cell, Plaintiff's inability to attend GED classes in 2017 for lack of ramps or elevators, the keep separate order issue in which Plaintiff was not given a single occupancy cell, Plaintiff missing recreation for lack of handicap access, and the incidents in which Plaintiff missed doctor's appointments or transfers because a wheelchair van was not available the day of the transfer.

As explained above, the claim related to the 2017 GED classes is time barred, and Defendants correctly note that the facility, upon Plaintiff's request, chose to install a handicap ramp to address the issue, so there is no evidence of intentional discrimination in the form of deliberate indifference as to that event even if that claim was not time barred. Likewise, as explained above, the keep separate order is a red herring – Plaintiff's records reveal only that he was ordered to keep separate from Allen *after* the April 26, 2018, attack, and was not subject to a single occupancy cell restriction as a result of that order, and thus that issue, too, fails to set forth a case of discrimination on account of Plaintiff's disability. Plaintiff's transportation issues likewise fail to indicate deliberate indifference or otherwise intentional discrimination – although the proper transportation vans were not available on the dates of initial transfers, Plaintiff was directly told by prison officials that the lack of wheelchair vans were a mistake, they apologized to him, and engaged in alternative arrangements. The missed doctor appointment issues are part of Plaintiff's 2017 Mid-State claims (*see* ECF No. 44 at 30), and are thus time barred, although they in any event appear to be mistakes rather than deliberate indifference. Plaintiff's recreation issues, too, appear to be part of the 2017 time barred Midstate claims (*see id.* at 28), and are thus time barred, although the Court notes that there, too, Plaintiff admits a ramp was built for his access, suggesting something short of deliberate indifference. Several of Plaintiff's claims regarding being in non-handicap cells, likewise, arise out of his 2017 stays in Mid-State and South

Woods State Prisons, and appear to be time barred as well. These events all therefore fail to serve as a basis for damages under the Acts.

What remains are Plaintiff's post-April 26, 2018, claims that he was placed for periods of time in cells which were not fully handicapped accessible.[4] The record and Plaintiff's own testimony indicate that, other than during brief punitive or medical observation periods, he was provided cells that were, at the very least, wheelchair accessible if not fully handicap friendly while in South Woods. Indeed, Defendant Tomlin testified that most cells in South Woods are wheelchair accessible, and Plaintiff's own grievances show that there were handicap shower facilities in the prisons in which he was housed, although the chairs for them were at times damaged. Although Plaintiff did have brief periods during which he was placed in units without full wheel chair access during his stay in New Jersey State Prison following a temporary transfer at the height of COVID when further movement was not practical, Plaintiff acknowledges that he was provided with alternative washing arrangements and an alternative system for getting into his wheelchair, albeit one which was not ideal. Nothing Plaintiff provides suggests that these events were motivated by intentional discrimination, but instead appear to be the fallout of several unrelated events – a fight in a processing facility, COVID-19 related lock downs, an unexpectedly tight cell door, or the like. All considered, though Plaintiff's prison stay was certainly not ideal,

---

[4] During his deposition, and in his original complaint, Plaintiff does make mention of several other negative incidents he experienced during his prison stay, including losing property, being denied full access to his civil attorney as officers told him that his attorney was not on his visitors list, facing negative treatment and discrimination as retaliation for filing complaints, and being denied physical therapy after having his braces confiscated. Those incidents, however, do not appear to be related to the ADA/RA claims, but instead appear to have been raised solely on the state law tort causes of actions discussed above. Plaintiff does not raise them in response to summary judgment on the ADA or RA claims here, nor does it appear they would stand as bases for damages claims under the Acts because in each incident the maltreatment was not related to wheelchair status, but instead to personal grudges, lost or stolen equipment, or general distaste unrelated to the wheelchair issue.

Plaintiff has failed to show facts clearly showing the type of intentional discrimination, arising to at least deliberate indifference on account of his disability, required to support his non-time barred claims for damages under the ADA and RA. Therefore, Defendants are entitled to summary judgment as to Plaintiff's claims for damages under the Acts.

### G. Plaintiff's Supervisory/Policy claims

In addition to his direct claims, Plaintiff attempts to raise his failure to protect claims and ADA/RA claims against the NJDOC and various supervisory defendants through a claim that DOC policies and a failure on the part of the DOC to train its officers caused the violations in question. Defendants argue that they are entitled to summary judgment as to these supervisory claims[5] because Plaintiff has failed to identify any DOC policy which was deficient or caused his injuries, and the Defendants have provided a number of policies which were adopted prior to the incidents in question which show that the DOC has developed a system for dealing with ADA claims through an ADA coordinator who attempts to ensure disabled inmates' needs are accommodated, that internal grievances are considered and handled, that prisoner complaints of wrongdoing are properly investigated, and that only reasonable force is used as necessary in response to disciplinary or dangerous issues. (ECF No. 37-2 through 37-8). In response to these arguments, Plaintiff argues that his supervisory claims should survive because he was assaulted by Allen who he believes should not have been placed in his cell, Plaintiff provided testimony connecting Officer

---

[5] Although Defendants do not argue the point, the Court notes that while the NJDOC may be a proper ADA defendant, the Department and its supervisory officials in their official capacities are immune from suit under § 1983, and that the Department and supervisors to the extent they are sued in their official capacities would be entitled to judgment on that basis as well. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health and Human Servs.*, 730 F.3d 291, (3d Cir. 2013); *Lenhart v. Pennsylvania*, 528 F. App'x 111, 114 (3d Cir. 2013); *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 280 (D.N.J. 2013). However, because they are entitled to judgment for the reasons set forth below in any event, the Court need not address that issue further.

Beattie to that allegedly improper placement, and Plaintiff erroneously construes Officer King as not understanding an officer's duties merely because he did not provide an extended response to questions about what his duties and responsibilities were. Plaintiff does not identify any actual policy which resulted in his injury in his response to summary judgment.

To be held responsible for a civil rights claim, a defendant must have "personal involvement" in the alleged wrong; a claim may not be premised solely on vicarious liability. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). A supervisor may therefore only be held liable where she either created a policy which caused the alleged wrong, participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinate's violations." *Murphy v. Middlesex County*, 361 F. Supp. 3d 376, 387 (D.N.J. 2019) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995)). To establish a claim based on the adoption of a policy, a plaintiff must prove that the supervisor "established or enforced policies and practices directly causing the constitutional violation" in question. *Chavarriaga*, 806 F.3d at 223. Making such a showing requires that the plaintiff identify the policy, custom, or practice in question specifically. *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). A failure to train or supervise claim is a subset of policy adoption claim which requires a showing that the failure to adopt further training policies amounts to "deliberate indifference to the rights of persons with whom [the defendant's] employees will come into contact." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (internal quotations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This will generally require a showing that "the need for more or different training is obvious, and [this] inadequacy [is] very likely to result in violation of constitutional rights." *Carter*, 181 F.3d at 357.

Here, Plaintiff has failed to identify any specific policy which caused or gave rise to or caused the violations in question, and the policies Defendants have provided severely undercut his assertion that prison policies were the driving force behind his claims. Likewise, a pithy answer from King during a deposition does not in any way show that there was an obvious need for more training. Indeed, King's testimony indicates that he was quite aware of the need to protect inmates from other prisoners who might attack them, as were the other officers he summoned to aid in removing Allen from Plaintiff's cell. Although King's response may, if the jury were to credit Plaintiff's version of events, be insufficient to prevent liability, it alone does not show an obvious need for more training such that the supervisory Defendants could be said to have been deliberately indifferent to Plaintiff's rights. Likewise, that Beattie allegedly had improper motives in assigning Allen to Plaintiff's cell does not indicate that the supervisors were, or should have been aware of that desire, nor that there was an obvious need for more training, rather than the failings of an individual officer. Plaintiff has failed to show that there was a policy which was the moving cause behind the violations in this matter, and has otherwise failed to show that the NJDOC or supervisory defendants were personally involved in the alleged wrongs, and the NJDOC and supervisors are therefore entitled to summary judgment on Plaintiff's civil rights claims.[6]

Finally, the Court notes that Defendants have also filed a motion to seal (ECF No. 38) in which they request that several exhibits attached to their motion for summary judgment be sealed as they contain confidential information including disciplinary actions, Plaintiff's medical history, and other private records. Plaintiff does not oppose this request. Given the obvious privacy

---

[6] Because the only claims which remain following this opinion are Plaintiff's claims against Beattie and King related to the April 26, 2018, failure to protect incident, and Defendants concede that Plaintiff is entitled to seek compensatory damages as to that claim, this Court need not address Defendants' final argument that Plaintiff has failed to show sufficient physical harm to be able to seek such damages as to his other claims on which Defendants will be granted summary judgment.

interests involved, the lack of opposition, and Defendants having shown good cause, this Court will grant the motion to seal.

## IV.    **CONCLUSION**

In conclusion, Defendants' motion to seal (ECF No. 38) is granted, and Defendants' Motion for Summary Judgment (ECF No. 36) is granted in part and denied in part.  An appropriate order follows.

Hon. Karen M. Williams,
United States District Judge